**UNIVERSITY OF MISSOURI AT COLUMBIA–NATIONAL EDUCATION ASSOCIATION and Paul K. Blackwell et al., Plaintiffs,**

v.

**John Hall DALTON et al., Defendants.**

**No. 76 CV 118–C.**

United States District Court,
W. D. Missouri, C. D.

Sept. 11, 1978.

George E. Kapke, Independence, Mo., for plaintiffs.

Jackson A. Wright, Columbia, Mo., Paul VanOsdol, Jr., Kansas City, Mo., for defendants.

## OPINION AND ORDER

ELMO B. HUNTER, District Judge.

## I

### Introduction

The University of Missouri-Columbia Chapter of the National Education Association (UMC–NEA) and the individual plaintiffs, employees of the University of Missouri-Columbia and members of the UMC–NEA, bring the above-styled action against the individual members of the Board of Curators of the University of Missouri (the governing body of the University) claiming that the defendants have violated their rights under the First, Fifth, and Fourteenth Amendments to the United States Constitution and under 42 U.S.C. § 1981 and § 1983. Plaintiffs seek declaratory and injunctive relief.[1]

More specifically, plaintiffs attack as violative of federal law a policy of the University which prohibits the use of University facilities, including use of the campus mailing system, to groups which are deemed to be labor organizations or which have as their goal the organization of University employees for purposes of collective bargaining.

This cause having been fully tried to the Court on July 11, 1978, the issues presented are now ripe for decision.

## II

### Uncontroverted Facts

The parties have agreed that the following facts are uncontroverted:

1. Plaintiffs Blackwell, Lankford and Edwards are individuals and employees of the University of Missouri at Columbia (UMC) and are members of UMC–NEA. UMC–NEA is the real party in interest and the three individual plaintiffs instituted this action on behalf of UMC–NEA.

2. UMC–NEA is a voluntary association of certified staff affiliated with the Missouri National Education Association (M–NEA) and the National Education Association (NEA).

3. The defendants comprise the Board of Curators of the University of Missouri, except that Howard Woods is now deceased and has not been finally replaced on the Board.

4. Professor Arthur L. Kalleberg wrote a letter to Chancellor H. W. Schooling on behalf of the UMC–NEA on November 5, 1975, requesting to be granted campus mailing privileges and the right to use campus facilities for meetings.

5. After November 5 and before November 17, 1975, UMC–NEA provided Chancellor Schooling with a copy of the constitution of UMC–NEA.

6. Chancellor H. W. Schooling, by letter of December 17, 1975, denied the request outlined in Dr. Kalleberg's letter of November 5, 1975.

7. Chancellor Schooling denied this request based upon a longstanding policy of the University of Missouri not to permit the use of University facilities for union activities.

8. There is a longstanding policy of the University of Missouri not to permit use of University facilities for union activities.

9. The firm of Piedimonte & Cochran, as attorneys for UMC–NEA, wrote Chancellor Schooling on January 5, 1976, renewing the association's request to use (a) campus mailing privileges and (b) campus facilities for meetings.

10. The general counsel for the University, Jackson A. Wright, commented on, explained and reaffirmed the existence of the

---

1. While plaintiffs originally sought compensatory and punitive damages in addition to their prayer for injunctive and declaratory relief, the Court was advised at trial that they have dropped their damage claims (Tr. 18, 35).

policy of the University not to furnish facilities to groups for collective bargaining or negotiation purposes by letter of January 22, 1976 to Thomas D. Cochran.

11. There exists no written policy denying unions use of University facilities or prohibiting the use of University facilities for union activities.

12. A faculty reservation clerk on the campus of the University of Missouri-Rolla allowed usage of University facilities to the Society of Professors, the NEA affiliate on that campus, but the defendants deny that the administration ever knowingly granted utilization of University facilities to the Society of Professors.

13. The American Association of University Professors (AAUP) has been granted use of University mailing facilities at UMC.

14. The AAUP has been granted use of University facilities for meeting purposes at UMC.

15. The AAUP has used the University mailing facilities at UMC.

16. The AAUP has used University facilities for meeting purposes at UMC.

17. UMC grants use of University facilities to the Missouri School Boards Association.

18. During the times material to this action, no request on behalf of UMC–NEA for the use of the campus mailing system or campus facilities for meeting was directed to the Board of Curators of the University of Missouri as such or to the individual curators.

### III

*Background*

*The functions and goals of UMC–NEA*

Initially it is helpful to gain an understanding of the functions and goals of UMC–NEA. Plaintiff Paul K. Blackwell, an associate professor of computer science at the University and immediate past president of UMC–NEA, described the Association thus, at Tr. 5–6:

"It is a professional organization for educators with the goals for improving the quality of education and improving the working conditions of the faculty. The interests are primarily to see that the salaries and fringe benefits of the faculty are adequate and the library facilities are kept up and appropriate for a university of our type; that the academic freedom is preserved. All the sorts of things that enter into the making of a great university. We are concerned with anything that contributes to higher education."

Throughout trial, there were many comparisons made between the NEA and the AAUP. The following line of testimony by Dr. Blackwell is instructive (Tr. 15–16):

"Q. What are the purposes and intents of the AAUP, if you know?

A. I believe they are very similar to our own purposes; primarily, the improvement of educational facilities at the University and guardian of the rights of the faculty, a desire to see better salaries and fringe benefits; generally, the same purposes as our own.

Q. What would you determine or suggest is the difference between the two associations?

A. Well, the difference on our local campus, I believe, is generally perceived to be one of the level of activism of the two groups. I think we are perceived as being more aggressive, more of an activist organization, where AAUP is simply not regarded that way. It is more sedate, perhaps."

Of relevance to the issues presented here are the different positions taken by the two groups on the issue of collective bargaining. The evidence clearly demonstrates that a major purpose of the UMC–NEA is, and has always been, to engage in collective bargaining with the University. This purpose is suggested by Article II of the association's Constitution, which states that it has as one of its goals the improvement of working conditions for all faculty members through "formal negotiations with the governing body of the University of Missouri."

Article VI of the UMC–NEA By-Laws provides for the organization of seven standing committees, two of which are the Collective Bargaining Council and the Negotiating Team. Section 7 of Article VI of the By-Laws provides as follows:

" . . . The Negotiating Team shall represent the bargaining unit in negotiations with the governing body of the U. of Missouri. It shall present proposals developed by the Collective Bargaining Council and it shall be empowered to revise these proposals as it deems proper during negotiations. The Negotiating Team shall report periodically on the progress of negotiations to the Executive Committee, the Collective Bargaining Council and the membership. The Negotiating Team shall submit the Master Agreement to the membership for a ratification vote. The Negotiating Teach shall represent the bargaining unit both in the negotiation of the Master Agreement and the follow-up negotiations which may flow out of the Master Agreement. . . . "

The December 1, 1975 edition of the UMC–NEA Newsletter, "Faculty Perspectives," contained the following statements pertinent to the collective bargaining issue:

"NEA and its state affiliate, the Missouri-National Education Association (M–NEA), are made up of almost two million teachers. At the college and university level, NEA is the national leader in organizing faculties for collective bargaining. It ranks far ahead of either AAUP or AFT.

\* \* \* \* \* \*

"The UMC–NEA chapter is committed to the goal of collective bargaining. At the present time that means several things: (1) To educate the UMC faculty; (2) To work for passage of public employee collective bargaining legislation in the legislature; (3) To cooperate with colleagues at UMR, UMSL and UMKC to educate and organize their faculties."

Further, on November 19, 1975, UMC–NEA applied to the District Director of the Internal Revenue Service "for recognition of exemption from Federal income tax as a labor organization." On IRS Form 1024, UMC–NEA, through its agent, stated:

"Our specific purpose, within the context of the general purposes outlined in our constitution, is to improve the working conditions, salaries, fringe benefits, teaching and research opportunities of the faculty of the University of Missouri-Columbia through the use of collective bargaining."

And, as stated in the December 30, 1976 issue of "Faculty Perspectives:"

"Ultimately, the purpose of the UMC–NEA chapter and its official publication, FACULTY PERSPECTIVES, is twofold: (1) To assist in the passage of enabling legislation by the Missouri General Assembly which will permit public employee collective bargaining (including teachers at all levels in the State); (2) to win a bargaining election and act as the agent for the University faculty."

It is beyond dispute that collective bargaining was a major and recurring theme of the UMC–NEA at and around the time of its formation. As plaintiff Blackwell has stated, at Tr. 34, 82:

"Q. Is it fair to say that your group was certainly emphasizing collective bargaining at the time you formed?

A. Yes, indeed.

\* \* \* \* \* \*

Q. Well, it is true, isn't it, Doctor—I don't want to be over-general—but, running through much of your publications is the theme of collective bargaining.

A. Yes. That is certainly correct."

In addition, a great deal of the media coverage surrounding the formation of the UMC–NEA focused on collective bargaining, as both Dr. Blackwell and Dr. Ratchford[2] acknowledged (Tr. 27, 54), and as the

2. Dr. Brice Ratchford, a witness called by defendants, is presently a Professor of Agricultural Economics at UMC and was President of the University at the time of the matters which are the subject of this suit.

following excerpt from the November 23, 1975 edition of the Columbia Missourian illustrates (defendants' exhibit 11):

"The National Education Association (NEA), which just has organized a chapter on the University campus, is a militant labor organization whose success is founded on increasing frustration and anxiety among college and university teachers.

"Its leaders say the NEA aggressively promotes collective bargaining, lobbying and political activity.

"Paul Blackwell, chairman of the University NEA chapter, has said his group is 'emotionally committed to collective bargaining' because it is the only way to get the University administration to listen to and to act upon faculty complaints.

\* \* \* \* \* \*

"The NEA is the leader among teacher organizations in the number of institutions at which it represents faculty in collective bargaining."

The St. Louis Globe Democrat of October 29, 1975, under the headline "NEA Seeking to Recruit UMC Faculty to Union," stated (defendants' exhibit 10):

"An effort is underway to organize professors at the University of Missouri-Columbia for collective bargaining, according to the Missouri National Education Association.

\* \* \* \* \* \*

"The president of the new chapter, Paul Blackwell,—is head of the university computer science department. He said the move is part of a drive by NEA to organize those involved in higher education in Missouri.

"Blackwell says the American Association of University Professors, which claims to represent more that 200 faculty members at the university, has not taken a strong enough stand on collective bargaining."

Plaintiff Blackwell testified that he was aware of the considerable publicity surrounding the formation of UMC–NEA, that the idea of collective bargaining was men-

tioned prominently in the newspapers in connection with UMC–NEA, and that one such newspaper article called UMC–NEA "a militant labor organization" (Tr. 27). The evidence further indicates that Dr. Blackwell never took issue with the accuracy of such press coverage. Moreover, despite ample opportunity to do so, plaintiff Blackwell never denied the characterization of UMC–NEA as being formed for the purpose of collective bargaining, nor did he contest the categorization of the organization as a labor union. (Tr. 38–39).

UMC–NEA's emphasis on collective bargaining developed, quite obviously, as the major distinguishing feature between it and the AAUP. As Dr. Ratchford testified, the AAUP gave assurances "that they intended to continue their many, many year policy of being a professional organization with no intent to enter or try for collective bargaining . . . " (Tr. 55; 64).

*The University policy with regard to use of campus mail and campus meeting rooms and the University policy with regard to organizations which have as one of their goals the promotion of collective bargaining*

With regard to the purpose and the proper use of the campus mailing system, Dr. Ratchford testified, at Tr. 45–46:

"The campus mail is to be used only for University business and official University—University groups that are enhancing University business. . . . Campus mails are not to be used for personal use by individuals or by groups who are not working directly in the interest of the University."

Dr. Blackwell described the typical kind of message that passes through the campus mail thus, at Tr. 81–82:

"There are many categories of mail. Announcements of meetings—in my case, as chairman of a department, all the correspondence I receive from the dean's office regarding matters of funding—all letters requesting permission to take some action, that is requesting permission

of the dean; mail back and forth between faculty members regarding research; or sending in grades to the registrar's office. All correspondence on the campus goes through the system."

Of further aid in understanding the use to which the University has allowed the campus mail to be put are two memos from the Business Officer of UMC to faculty members. The first, dated October 8, 1969, pertained to an open letter to all faculty members encouraging them to suspend "business as usual" on October 15, 1969 and participate in a National Moratorium in an effort to increase public pressure against the Vietnam War. This letter's being circulated through the Campus Mail drew the following response from the UMC Business Officer (defendants' exhibit 4):

> "It was called to my attention yesterday that the attached material was distributed in the University campus mail in violation of the official purpose for which the campus mail was intended. The Board of Curators established and financed University campus mail for the purpose of conducting official University business. It is not to be used for personal purposes or other than University business. Please call this matter to the attention of your respective staff members."

With regard to another matter, the Business Officer sent out the following April 19, 1976 memo to members of the UMC Faculty (defendants' exhibit 3):

> "Recently, certain faculty members have used campus mail for the purpose of advertising the fact that they have a house for rent. This is improper use of campus mail since it is not official University business."

With regard to the University's method of policing the campus mail, Dr. Ratchford testified that it is "policed after the fact," and if it comes to the University's attention that an organization has improperly used the campus mail, "then there is a slap on the wrist. And, in cases, we have even had the organization go back and pay postage" (Tr. 56–57).

Dr. Ratchford further testified that the AAUP was allowed to utilize the campus mail "[s]ince they are one of the organizations we consider as a professional organization" (Tr. 58) and further because it was determined that the AAUP benefitted the University (Tr. 59).

With regard to use of campus facilities in general, Dr. Ratchford testified that it was the policy of the University of Missouri not to allow organizations which seek to engage in collective bargaining to use those facilities (Tr. 68). He emphasized, however, and this Court finds, that the University has no policy against faculty unions. As he stated at Tr. 53–54:

> "[I]f faculty want to unionize, they can unionize. The rule relates to the use of facilities. . . . There is no rule against unionizing."

Nor did the University have any objection to UMC–NEA forming on the UMC campus. According to an article appearing in the St. Louis Globe Democrat of October 29, 1975 (defendants' exhibit 10, received into evidence without objection):

> "The NEA announced Tuesday a new chapter has been formed on the Columbia campus and has begun recruiting faculty members.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> "UMC Chancellor Herbert Schooling said he didn't know the group was forming until Tuesday. Schooling says he has no objection to the group recruiting on the Columbia campus."

In sum, as far as the University is concerned, a professor may join any legal organization he wishes (Tr. 61).

This does not mean, however that distinctions are not drawn between organizations that professors may join.[3] The following

---

**3.** It should be observed at this point that while there is a procedure whereby student groups are either officially recognized or not officially recognized by the University and whereby those student groups which are officially recognized are financially supported by University funds (Tr. 46), there is no comparable procedure for recognizing faculty organizations (Tr. 47).

line of testimony is helpful in this regard (Tr. 61):

"Q. You have never told faculty members what organizations they could or could not belong to?

A. [By Dr. Ratchford]: That is correct.

Q. So what you are saying is that any professor can join any legal organization he wishes.

A. Right.

Q. But there are distinctions drawn between organizations that professors may join, are there not?

A. Yes.

Q. Some organizations are granted the privilege of using the University mail facility and using University facilities for meeting rooms and things of that nature?

A. To me, there are only two exceptions.

Q. Two exceptions to what?

A. To the rule that they can use—they can belong to an organization and use it, is the policy on unions—I will use that term—or collective bargaining, and all of the words that add up to that. And if it is for profit-making purposes for a faculty member or a small group of faculty members—

THE COURT: Those two are not permitted to use the University facilities?

THE WITNESS: That is correct."

This policy against allowing groups who seek to engage in collective bargaining with the University to use University facilities for their organizational purposes was adopted by the Board of Curators in 1966 (Tr. 52) and has been applied to organizations other than UMC–NEA, as indicated by the following line of testimony by Dr. Ratchford, at Tr. 51:

"Q. Dr. Ratchford, did the University, at the time in question and possibly previously, have a kind of a policy in regard to union activity or collective bargaining, or call it what you will, on the campuses?

A. Yes, they did. At the time, Local 45 at the Columbia campus—and they have a similar union on the other campuses, Operating Engineer No. 2 at St. Louis and Rolla, and a thousand or something here in Kansas City—but they all came along at the same time. The Board, when they finally decided that they would recognize them—allow unionization—and that they would listen but not be bound by their demands—indicated that they could not use University facilities for organizing or conducting business. And that decision has been consistent, and, as far as I know, it has been enforced."

The University policy toward unionization and collective bargaining is described by Dr. Ratchford, at Tr. 63, as a "hands off" policy:

"The University has not taken a position that collective bargaining or unionization is bad for the University. We have taken the stance of 'hands off' in the sense that if any group—and they have gone through the regular procedures and unionized, the University works with them, but then there is a hands off policy, a part of which is not using university facilities."

*UMC–NEA's request for use of University facilities and the University's denial thereof*

By letter dated November 5, 1975 to Dr. Herbert W. Schooling, UMC Chancellor, Professor Arthur L. Kalleberg, the then Secretary of UMC–NEA, requested "permission for the local Chapter, as an organization composed of UMC faculty and support personnel, to be granted (1) campus mailing privileges and (2) the right to use campus facilities for meetings." By letter to Dr. Kalleberg dated December 17, 1975, Chancellor Schooling indicated that he had carefully reviewed the UMC–NEA Constitution and concluded:

"Based upon such review [of the UMC–NEA Constitution], it appears that at least one of the major objectives of your organization is the organization of the faculty for collective bargaining or negotiation purposes. As such, it must be treated in the same manner as labor unions.

"Since it is the long standing policy of the University not to permit the use of Uni-

versity facilities for union activities, I must deny your request (1) to use campus mailing privileges and (2) the right to use campus facilities for meetings or otherwise." [plaintiffs' exhibit 4]

By letter to Chancellor Schooling dated January 5, 1976 (plaintiffs' exhibit 5), Mr. Thomas D. Cochran, attorney for plaintiffs, protested the fact that Chancellor Schooling had referred to UMC–NEA as a labor union and argued that because it is not a labor union, it should not be subject to any University policy denying use of University facilities for union activities. In response to this letter, Mr. Jackson A. Wright, General Counsel for UMC, made the following observations in his letter of January 22, 1976 (plaintiffs' exhibit 6):

> "Your letter states that Chancellor Schooling has branded UMC–NEA as being a labor union. With this I disagree. He simply states that at least one of its major objectives is the organization of the faculty for collective bargaining or negotiation purposes. Regardless of what you may call the group, whether association or labor union, their actions and stated purposes will govern, and the policy of the University is not to furnish facilities to groups for collective bargaining or negotiation purposes.
>
> "You state in your letter that UMC–NEA is not a labor union 'and is not intended to be such.' If such be the case, what is the purpose and meaning of the 'Collective Bargaining Committee' whose chairperson is named as an officer in Article IV of the constitution, and of the standing committees for 'Collective Bargaining' and 'negotiating team' provided for in Article VI of the by-laws?
>
> "It seems to me that these committees and their purposes as spelled out in Article VI, make it pretty clear that they are, regardless of the label attached, union oriented activities, and as such will fall within the University's policy.

"Statements made by the organization's officers have been equally explicit, if not more so."

Broadly stated, whether this denial of University facilities contravenes plaintiffs' rights under federal law is, of course, the issue to be determined. Before exploring the merits of that issue, however, a preliminary question must be resolved: Whether the named defendants have had the requisite involvement in the matters which form the basis of this lawsuit to subject themselves to liability under 42 U.S.C. § 1983.

### IV

*The Personal Involvement/Causation Question Under 42 U.S.C. § 1983*

Defendants first contend that they cannot be successfully sued under 42 U.S.C. § 1983 because there has been no demonstration that they were personally involved in the alleged denial of plaintiffs' federal rights. This contention is without merit.

■■■ It is, of course, true that supervisory personnel cannot be held liable under 42 U.S.C. § 1983 merely because an underling violates a person's federal rights under color of state law. As this Court stated in *Jennings v. Davis*, 339 F.Supp. 919, 921 (W.D.Mo.1972), *aff'd*, 476 F.2d 1271 (8th Cir. 1973):

> "Where the relief sought under the Civil Rights Act is monetary damages, rather than equitable relief, the doctrine of respondeat superior is not available to impose vicarious liability upon a defendant who has no personal involvement in the alleged deprivation of plaintiff's federally-protected rights.
>
> \* \* \* \* \* \*
>
> "Rather, in order for there to exist liability for monetary damages under the Civil Rights Act, there must be a showing that the defendant personally and directly participated in the acts which were allegedly violative of plaintiff's rights under federal law." [4]

---

4. It should again be observed that plaintiffs seek only equitable relief in this lawsuit. While this does not mean that plaintiffs are permitted to place total reliance on the respondeat superior doctrine in making their case against defendants, *see Rizzo v. Goode*, 423

This "personal involvement" prerequisite to liability under § 1983 is perhaps more correctly stated in terms of a causation test. Such a test is consistent with the language of the statute itself, which reads:

"Any person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, *or causes to be subjected*, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress" [emphasis added].

As the Court stated in *Sims v. Adams*, 537 F.2d 829, 831 (5th Cir. 1976):

"The language of § 1983 requires a degree of causation as an element of individual liability, but it does not specifically require 'personal participation.' The proper question is therefore whether the complaint adequately alleges the requisite causal connection between the supervisory defendants' actions and a deprivation of plaintiff's constitutional rights. 'Personal participation' is only one of several theories which can be used to establish causation."

The causation test for determining liability of supervising personnel under § 1983 was utilized by the Supreme Court in *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) in holding that the Mayor, City Managing Director, and the Police Commissioner of Philadelphia could not be held liable under § 1983 for alleged illegal police mistreatment of minority citizens in particular and Philadelphia residents in general. In so ruling, the Court emphasized that "*there was no affirmative link* between the occurrence of the various incidents of police misconduct and the adoption of any plan or policy by petitioners—express or otherwise—showing their authorization or approval of such misconduct."

U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), the cases do hold that "when equitable relief is sought as opposed to monetary damages, the requirements of personal involvement and the

*Id.*, at 371, 96 S.Ct. at 604, 46 L.Ed.2d at 569 [emphasis added].

In the more recent case of *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Court again utilized the causation test, this time with regard to the § 1983 liability of a local governing body for the acts of its employees. As the Court stated at 690–692, 98 S.Ct. at 2036:

"Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, *the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.*

\* \* \* \* \* \*

"On the other hand, . . . Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature cause a constitutional tort. In particular, we conclude that a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory. [emphasis in the original].

\* \* \* \* \* \*

"[Section 1983] plainly imposes liability on a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights. At the same time, that language cannot be easily read to impose liability vicariously on governing bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor. Indeed, the fact that Congress did specifically provide that A's tort became B's liability if B 'caused' A to subject another to a tort suggests that Congress did not intend § 1983 liability to attach where

allegation thereof are not as rigid." *Downs v. Department of Public Welfare*, 368 F.Supp. 454, 464 (E.D.Pa.1973).

such causation was absent" [emphasis added, except where otherwise noted].

The Court carried its analysis one step further at 690, fn. 55, 98 S.Ct. at 2036, when it stated that "our holding today that local governments can be sued under § 1983 necessarily decides that local government officials sued in their official capacities are 'persons' under § 1983 in those cases in which, as here, a local government would be suable in its own name."

■ It is, therefore, quite clear that the individual defendants, as members of the Board of Curators of the University of Missouri, by adopting a policy of not permitting use of University facilities by unions or associations which have as one of their major goals collective bargaining with the University, caused, or was an affirmative link in causing, Chancellor Schooling and President Ratchford to deny plaintiffs their request that they be permitted to utilize campus facilities for UMC–NEA purposes. Put another way, "the action that is alleged to be unconstitutional [i. e., Chancellor Schooling's and Dr. Ratchford's denials of plaintiffs' requests for use of campus facilities] implements or executes a policy statement . . . adopted and promulgated by" the defendants in their capacities as members of the Board of Curators.

Consequently, defendants may be held answerable, under 42 U.S.C. § 1983, for the actions taken by various University officials which are the subject matter of this lawsuit.

The substance of those federal rights enjoyed by plaintiffs which defendants allegedly transgressed under color of state law will now be examined.

V

*The Claim Under 42 U.S.C. § 1981*

■ As there is no allegation or proof that defendants discriminated against plaintiffs on the basis of race or alienage, plaintiffs' claim under 42 U.S.C. § 1981 must fail.

VI

*The First Amendment and Equal Protection Claims*

■ As the evidence makes clear, and as this Court specifically finds, but for UMC–NEA's advocacy of collective bargaining, it would have been permitted the use of campus meeting rooms and campus mail. While Missouri law prohibits University faculty members from collectively bargaining with the University, R.S.Mo. § 105.510 and § 105.520, the evidence clearly demonstrates, and this Court specifically finds, that UMC–NEA's position on collective bargaining was such that there was absolutely no likelihood that imminent lawless action would result therefrom. In fact, the evidence persuades the Court that UMC–NEA is committed to work within the law of the State of Missouri to effect the changes it desires. Reference should again be made to the December 30, 1976 issue of "Faculty Perspectives," which states:

"Ultimately, the purpose of the UMC–NEA chapter and its official publication, FACULTY PERSPECTIVES, is twofold: (1) To assist in the passage of enabling legislation by the Missouri General Assembly which will permit public employee collective bargaining (including teachers at all levels in the State); (2) to win a bargaining election and act as the agent for the University faculty."

Quite plainly, under the facts of this case, it cannot be said that UMC–NEA's advocacy of collective bargaining "is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Bradenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430, 434 (1969). That the UMC–NEA Constitution and By-Laws provided for the formation of a "Negotiating Team" and a "Collective Bargaining Council" persuades the Court only that plaintiffs were prepared to begin the collective bargaining process with the University if and when it became legal to do so. That such provisions do not make a violation of state law "imminent" becomes particularly clear when one considers that plaintiffs must have a good measure of

cooperation from defendants before they can engage in collective bargaining with the University and thereby violate the statutory prohibition.[5]

■ Nor is the Court persuaded by defendants' argument that any adverse effects which the University's policies may have upon UMC–NEA are so slight as to fail to rise to the level of a Constitutional deprivation. In *Healy v. James,* 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972), the Court was faced with a college's denial of official recognition of a student group.[6] At 181–83, 92 S.Ct. at 2346, 33 L.Ed.2d at 279–81, the Court stated:

"Among the rights protected by the First Amendment is the right of individuals to associate to further their personal beliefs. . . . There can be no doubt that denial of official recognition, without justification, to college organizations burdens or abridges that associational right. The primary impediment to free association flowing from nonrecognition is the denial of use of campus facilities for meetings and other appropriate purposes.

\* \* \* \* \* \*

"Petitioners' associational interests also were circumscribed by the denial of the use of campus bulletin boards and the school newspaper. If an organization is to remain a viable entity in a campus community in which new students enter on a regular basis, it must possess the means of communicating with these students. Moreover, the organization's ability to participate in the intellectual give and take of campus debate, and to pursue its stated purposes, is limited by denial of access to the customary media for communicating with the administration, faculty members, and other students. *Such impediments cannot be viewed as insubstantial.*

\* \* \* \* \* \*

"In [the district] court's view all that was denied petitioners was the 'administrative seal of official college respectability.' . . . A majority of the Court of Appeals agreed that petitioners had been denied only the 'college's stamp of approval.' . . . Respondents take that same position here, arguing that petitioners still may meet as a group off campus, that they still may meet together informally on campus—as individuals, but not as CCSC–SDS.

"We do not agree with the characterization by the courts below of the consequences of nonrecognition. . . . [I]n this case, the group's possible ability to exist outside the campus community does not ameliorate significantly the disabilities imposed by the President's action. We are not free to disregard the practical realities. Mr. Justice Stewart has made the salient point: 'Freedoms such as these are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference.' *Bates v. City of Little Rock,* 361 U.S. 516, 523, 80 S.Ct. 412, 4 L.Ed.2d 480, 485 (1960)" [emphasis added].

---

5. Defendants have made no demonstration that any of plaintiffs' actions made imminent a violation of Missouri's prohibition against strikes by public employees.

6. The Court is, of course, aware that the University of Missouri has a procedure whereby it officially recognizes student organizations (this official recognition entitling the organization to financial support), while having no such procedure with regard to faculty organizations.

This does not, however, materially distinguish the present case from *Healy v. James,* for as the *Healy* Court stated at 182, fn. 8, 92 S.Ct. at 2346, 33 L.Ed.2d at 280: "It is unclear on this record whether recognition also carries with it a right to seek funds from the school budget. Petitioners' counsel at oral argument indicated that official recognition entitled the group to 'make application for use of student funds.' . . . The first District Court opinion, however, states flatly that '[r]ecognition does not thereby entitle an organization to college financial support.' 311 F.Supp. 1275, 1277 (D.C.). Since it appears that, at the least, recognition only entitled a group to *apply* for funds, and since the record is silent as to the criteria used in allocating such funds, we do not consider possible funding as an associational aspect of nonrecognition in this case."

It having been thus determined that UMC–NEA's advocacy of collective bargaining was the sole cause of the University's decision to deny it the use of University facilities and that such denial imposed impediments to plaintiffs' free speech and associational interests that cannot be characterized as insubstantial, the conclusion is compelled that such denial is violative of the Federal Constitution. This is so even though UMC–NEA may have no independent right to the use of such facilities. As stated in *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570, 577 (1972):

"For at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which [it] could not command directly.' *Speiser v. Randall,* 357 U.S. 513, 526, 78 S.Ct. 1332, 2 L.Ed.2d 1460, 1473. Such interference with constitutional rights is impermissible."

When viewed against the requirements of the Equal Protection clause of the Fourteenth Amendment, the unconstitutionality of the University's denying UMC–NEA the use of campus facilities becomes even more apparent. On the record before the Court, the only material distinction that can be drawn between UMC–NEA and the American Association of University Professors is that the former has as one of its goals collective bargaining with the University while the latter does not. In all other respects, the organizations are, on this record, practically identical. As the evidence demonstrates, and as this Court specifically finds, it is this distinction, and this distinction only, that forms the basis of the University's denial of campus facilities to UMC–NEA while granting use of those facilities to the AAUP.

■ Defendants have offered no compelling state interest (nor any reason rationally related to a legitimate state objective) to justify their differing treatment of these similarly situated faculty organizations. Certainly, defendants cannot justify their discrimination against UMC–NEA on the basis that it seeks repeal of the Missouri statutes prohibiting teachers from engaging in collective bargaining while the AAUP does not. *Gay Lib v. University of Missouri,* 558 F.2d 848, 856, fn. 16 (8th Cir. 1977), *cert. den.* 434 U.S. 1080, 98 S.Ct. 1276, 55 L.Ed.2d 789 (1978). The University's contention that it must take a "hands off" attitude toward groups which advocate collective bargaining and that this attitude necessarily requires that it not lend such groups the use of campus meeting rooms and campus mail merely begs the question to be answered rather than illustrating any legitimate state objective that is rationally being furthered by the discriminatory practice at issue.

■ . It is quite clear that while the University has no obligation to provide the use of its facilities to faculty organizations, once it does so, it cannot refuse to grant such facilities to one faculty organization in particular because of that organization's position in opposition to a certain state statute, absent a compelling state interest. Consequently, not only does the University transgress plaintiffs' First Amendment rights, but it has violated the Equal Protection clause of the Fourteenth Amendment as well in denying UMC–NEA access to campus meeting rooms and the campus mail.

## VII

### *Conclusion*

For the reasons above stated, this Court holds and declares that defendants' refusal

to allow plaintiff UMC–NEA the use of the campus mail and campus meeting rooms is violative of the First Amendment and the equal protection clause of the Fourteenth Amendment to the United States Constitution.

Because "a federal court should issue its injunctive process against state or local officers only in situations of most compelling necessity, and this Court has no indication that this Court's decision will be ignored by the named individual defendants," *Vorbeck v. McNeal,* 407 F.Supp. 733, 739 (E.D.Mo.1976), *aff'd* 426 U.S. 943, 96 S.Ct. 3160, 49 L.Ed.2d 1180 (1976), plaintiffs' request for injunctive relief will be denied. *See also Atkins v. City of Charlotte,* 296 F.Supp. 1068, 1078 (W.D.N.C. 1969).

IT IS SO ORDERED.[7]

---

7. In view of this Court's holding on the First Amendment and equal protection claims, plaintiffs' due process claim need not be reached.