William J. DOORES, Plaintiff,

v.

Joseph McNAMARA et al., Defendants.

Civ. A. No. 77–CV–0080–W–3.

United States District Court,
W. D. Missouri, W. D.

Sept. 21, 1979.

Robert N. Adams, Kansas City, Mo., for plaintiff.

Manfred Maier, Kansas City Police Dept., Kansas City, Mo., for McNamara.

Harry Thomson, Shughart, Thomson, Kilroy, Kansas City, Mo., for Davis, Gibson, Werner and Bivins.

Daniel G. Jackson, III, Kansas City, Mo., for Wheeler.

## ORDER

RUSSELL G. CLARK, District Judge.

Plaintiff, William Doores filed a complaint pursuant to 42 U.S.C. § 1983 on February 3, 1977 against former members of the Board of Police Commissioners, Ilus Davis, John Gibson, Faye S. Werner, Edward Bivens and Charles Wheeler, and the former Chief of Police, Joseph McNamara. Plaintiff alleged that the defendants wilfully and wrongfully refused to reemploy plaintiff as a police officer while employing less qualified individuals classified as minorities.

Jury trial of the above cause of action commenced on Wednesday September 12, 1979 at 9:00 a. m. At the conclusion of the evidence, after hearing argument on defendants' motion for a directed verdict, the court directed a verdict for all defendants. In directing the verdict pursuant to Rule 50(a) of the FRCP the court set forth three basis for its ruling: 1. Assuming actionable conduct plaintiff had failed to demonstrate the requisite personal involvement of these defendants. 2. The defendants had demonstrated they were entitled to rely on the doctrine of qualified immunity. 3. Plaintiffs had not demonstrated that the employment practices violated the Equal Protection Clause. In an effort to provide the parties with a more detailed and comprehensive explanation of its reasons for directing a verdict, the court is issuing this memorandum opinion supplementing its remarks of September 14, 1979.

*Findings of Fact*

Evidence presented at trial established the following:

1. Plaintiff Doores resigned from the Kansas City, Missouri Police Department on June 11, 1975 with an effective date of June 24, 1975, last day on the payroll July 3, 1975, having been employed by the Police Department since March 16, 1962.

2. In September or early October 1975, William J. Doores made initial inquiries concerning possible re-employment with the Kansas City, Missouri Police Department at the rank of police officer.

3. William J. Doores between the dates of October 28, 1975 and December 4, 1975 completed the required pre-hiring tests and examinations necessary for all job applicants.

4. On December 11, 1975, William J. Doores was notified of his inclusion on the Kansas City, Missouri Police Department eligible applicant list subject to additional physical mental and background tests if his effective appointment date was more than 60 days after the original notification.

5. The initial recruit class formed after Doores conditional application approval was in May 1976, Entrant Officer Class No. 150.

6. Two additional entrant officer classes were formed in September 1976, No. 151, and December 1976, No. 152, prior to William J. Doores' refusal to accept appointment to class No. 153 on January 7, 1977, said class to begin in March, 1977.

7. General Order No. 74–5, Equal Employment Opportunity-Affirmative Action Plan, was issued by Defendant McNamara on April 6, 1974 and was in full force and effect at all times pertinent to plaintiff's complaint.

8. At all times pertinent to plaintiff's complaint, the Kansas City, Missouri Police Department was not subject to the order of a court of competent jurisdiction with regard to court imposed minority hiring goals.

9. The minority population of Kansas City, Missouri is 22.9% of the total population, utilizing Table 23, 1973 Edition Statistical Abstract of the United States.

10. During the time pertinent to plaintiff's complaint, the Kansas City Police Department hired 88 officers, of whom 52 were white males (59%), 6 were white females (7%), 16 were black males (18%), 10 were black females (11%), and 4 were Spanish surnamed males (5%). During the time in question, minorities made up approximately 5% of the police force.

11. The affirmative action goals of the Kansas City, Missouri Police Department seek to achieve through initial hiring and rehiring an overall minority representation of from 15% to 16% based upon the currently available work force and subject to budgetary constraints and normal employee attrition, there being no fixed numbers for any given entrant officer class.

12. Plaintiff's test scores as computed by the Personnel Division from the objective rating table was 16.

13. Members of the minority races were selected to attend recruit class 150 beginning May 3, 1976, with total scores of less than 16 points.

14. The Chief of Police of the Kansas City Police Department is the chief executive officer of the Kansas City Police Department and is responsible to the Board of Police Commissioners.

15. The Board of Police Commissioners is charged by statute to select a Chief of Police and is responsible for determining department policy and the Chief of Police is responsible to the Board of Police Commissioners for the proper execution of policies, duties and responsibilities established for the administration of the police department.

16. During the period from January 1975 to January 1977 there was no policy in effect to bar the re-employment of former police officers and, in fact, five male Caucasian former police officers were re-employed.

17. All applicants for employment who passed the tests administered as part of the application process were placed on an eligibility list.

18. Names of the individuals and the composite scores were contained on this list. (See Exh. 23 as an example).

19. Lova Jo Kistler testified that normally she did not compute scores for minority class members because qualified minorities were placed in the next available class. Mrs. Kistler indicated that her supervisor, Sgt. Richardson, instructed her to put all qualified minorities in the next available class. Mrs. Kistler further indicated that white males were generally selected for a class based on their composite score. Those with the highest scores being chosen for the vacancies in the class.

20. Files of potential candidates for the next class were sent to Troy Majors who testified that he picked members of each class based on his judgment.

21. Troy Majors indicated that in determining the makeup of a class many factors were considered and no single factor was relied on.

22. Troy Majors indicated it was his decision not to put Mr. Doores in the May 1976 class or the following two classes. He never received any communication from any member of the Board of Police Commissioners or the Chief of Police concerning whom he should put in a particular class. Additionally, he never discussed with Chief McNamara whether plaintiff Doores should be rehired.

23. Troy Majors testified that if the criterion of composite test scores had been the sole factor considered in placing individuals in the police training classes, plaintiff Doores would not have been selected for the May class.

24. Troy Majors testified that if date of application was the sole criterion used for placing individuals in the police training classes, plaintiff Doores would not have been selected for the May 1976 class.

25. Both Lova Jo Kistler and Sgt. Richardson indicated they never had any contact

with any member of the Board of Police Commissioners concerning the hiring practices or the hiring of particular individuals.

26. Ilus Davis, Faye Werner, Ed Bivens, and John Gibson all testified they did not recall ever receiving any complaint (plaintiff's Exhibit 3) from Mr. Doores concerning his EEOC charges.

27. Mr. Charles Wheeler received a copy of a letter sent to Charles Clark, Director of the EEOC on May 19, 1977 and referred the letter to the City Hall Legal Department.

28. Defendant Charles Wheeler indicated that as a member of the Board of Police Commissioners he intended for the best qualified candidates to be sent to the Police Academy and that the actual selection was left to the discretion of the Police Chief. Further, defendant Wheeler indicated the "best qualified" should take into consideration several factors including educational and physical qualifications as well as correcting a racial imbalance on the police force.

29. The only involvement of the Board of Police Commissioners in the employment practices challenged in this case was the Board's approval of an affirmative action plan.

30. There was testimony indicating there had been a serious race riot in 1967. There was considerable expert testimony that this riot might have been prevented had there been a more representative representation of minorities (particularly blacks) on the police force. The same experts testified without exception that the efficiency of any metropolitan police force and peaceful solution within such area would be greatly enhanced by having as near as possible the same percentage of minorities on the police force as that which they represented in the community population.

*Standards for Directing a Verdict*

Rule 50(a) provides that the court may direct a verdict at the close of all the evidence. Whether the evidence is sufficient to create an issue of fact for the jury is solely a question of law to be determined by the court. The standard to be used by the court in determining whether a motion for a directed verdict should be granted is whether the evidence is such that without weighing the credibility of the witnesses or otherwise considering the weight of the evidence there can be but one conclusion as to the verdict that reasonable men could have reached. *Simblest v. Maynard,* 427 F.2d 1, 4 (2d Cir. 1970). In making this determination the evidence together with all reasonable inferences to be drawn therefrom must be reviewed in a light most favorable to the nonmoving party. *Hladyshewski v. Robinson,* 557 F.2d 1251 (8th Cir. 1977); *Giordano v. Lee,* 434 F.2d 1227, 1231 (8th Cir. 1970); *Meitz v. Garrison,* 413 F.2d 895, 896 (8th Cir. 1969).

The Court recognizes that the Eighth Circuit has indicated that the preferred practice:

> is to reserve ruling on a motion for a directed verdict until after the verdict in order to "avoid a retrial with its resulting delay, trouble and expense and the possibility of a second appeal." *Hladyshewski v. Robinson, supra,* at 1255. Footnote 3.

If this were a civil action between two private parties as in the above cited case the court would have followed this preferred practice even though it might have been convinced of plaintiff's failure to make a submissible case. In this case, however, where public officials have been sued for acts undertaken in the performance of their official duties, the Court believes the parties and the public are entitled to a ruling on the legal issues where the Court is firmly convinced that the evidence satisfies the standards for directing a verdict. If the Court had submitted the case to the jury and a verdict returned in favor of the defendants, the Court would not have had an opportunity to address the issues raised in defendants' motion for a directed verdict. The Court feels that in the circumstances of this case it is obligated to consider and discuss the issues raised by defendants' motion for a directed verdict.

*Personal Involvement*

It is well established that the doctrine of respondeat superior does not apply

in an action for damages under 42 U.S.C. § 1983. *Duchesne v. Sugarman,* 566 F.2d 817 (2d Cir. 1977); *Arroyo v. Schaefer,* 548 F.2d 47 (2d Cir. 1977); *Sebastian v. United States,* 531 F.2d 900, 904 (8th Cir. 1976), *cert. denied,* 429 U.S. 856, 97 S.Ct. 153, 50 L.Ed.2d 133 (1977). The language of 1983, "[e]very person who, . . . subjects, or causes to be subjected . . ." clearly requires a degree of causation as an element of individual liability. Personal participation, however, is only one of several theories which can be used to establish causation. *Sims v. Adams,* 537 F.2d 829, 831 (5th Cir. 1976); *Univ. of Missouri v. Dalton,* 456 F.Supp. 985 (W.D.Mo.1978).

In addition to the imposition of liability on supervisory personnel on the basis of personal participation in the act, it may also be premised on their directing the action to be taken, or acquiescing with knowledge in its commission. *Jones v. Board of Police Commissioners,* 435 F.Supp. 797 (E.D.Mo.1977). In this case there was no evidence that any of the members of the Board of Police Commissioners had any actual involvement in the failure of the personnel department to place plaintiff in the three classes formed immediately after his application was accepted. No evidence was developed that these defendants had directed the hiring practices complained of or even acquiesced with knowledge in the procedures utilized by the hiring department. The mere fact that Mayor Wheeler remembered receiving a copy of a letter sent by plaintiff to the EEOC Commission concerning his EEOC charges does not demonstrate the requisite personal involvement. Further, there was no evidence that the manner in which Mayor Wheeler dealt with the letter referring it to the legal department for investigation was unreasonable or negligent.

The approval of an affirmative action plan by the Board members and its adoption by Chief McNamara in this case would not appear to be a sufficient basis for imposing liability. The court recognizes that where supervisory personnel have affirmatively promoted a policy which sanctioned the action which caused the violation, liability under § 1983 has been imposed. *Duchesne v. Sugarman,* 566 F.2d 817, 831 (2d Cir. 1977). In this case the Court found that the affirmative action plan approved by the Board and adopted by Chief McNamara did not sanction unequal treatment based on race, nor did it mandate that any type of quota system be utilized. At no time prior to the filing of this complaint were these defendants put on notice that impermissible methods of implementing the plan had been adopted. Plaintiff's Exh. 7, a copy of the Affirmative Action Plan signed by Chief McNamara, provided in part:

II. Policy

A. The employment policies and practices of the Kansas City, Missouri Police Department are to recruit and to hire employees without discrimination because of race, creed, color, sex or national origin, and to treat them equally with respect to compensation and opportunities for advancement, including upgrading, promotion, and transfer.

B. . . .

C. The Department agrees to assert leadership within the community and to put forth the maximum effort to achieve full employment and utilization of the capabilities and productivity of all our citizens without regard to race, creed, color, sex or national origin.

D. The Department further recognizes that the effective application of a policy of merit employment involves more than just a policy statement and will therefore undertake a program of affirmative action to make known that equal employment opportunities are available on the basis of individual merit and to encourage all persons to seek employment with the department and to strive for advancement on this basis.

Secondly, the Court determined that the named defendants were entitled to a qualified immunity from damages. The courts have consistently recognized that public officials such as the defendants who are required to exercise discretion in the

course of their responsibilities are in certain circumstances entitled to a qualified immunity for actions taken during the course of their official duties. The reasons given by the Supreme Court of the necessity of retaining some portion of a common law immunity in cases brought under 42 U.S.C. § 1983 is especially appropriate in this case:

Liability for damages for every action which is found subsequently to have been violative of [an individual's] constitutional rights and to have caused compensable injury would unfairly impose upon the . . . decisionmaker the burden of mistakes made in good faith in the course of exercising his discretion within the scope of his official duties . . . Denying any measure of immunity in these circumstances "would contribute not to principled and fearless decision-making but to intimidation." . . . The imposition of monetary costs for mistakes which were not unreasonable in the light of all the circumstances would undoubtedly deter even the most conscientious . . . decisionmaker from exercising his judgment independently, forcefully, and in a manner best serving the long-term interest of [the public] . . .

*Wood v. Strickland,* 420 U.S. 308, 319–320, 95 S.Ct. 992, 999–1000, 43 L.Ed.2d 214, 223–224 (1975).

The Supreme Court in *Scheuer v. Rhodes,* 416 U.S. 232, 247, 94 S.Ct. 1683, 1692, 40 L.Ed.2d 90, 103 (1974) established the standard when a defendant is entitled to this qualified immunity:

[A] qualified immunity is available to officers of the executive branch of government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct. *Scheuer, supra,* 416 U.S. at 247, 94 S.Ct. at 1692, 40 L.Ed.2d at 103.

This qualified immunity good faith defense contains both subjective and objective components. The subjective aspect of the good faith defense requires the defendant to have acted sincerely and with a belief that his actions were proper. In addition to subjective good faith, the action when viewed objectively must not violate well established and unquestionable constitutional rights. Qualified immunity cannot be utilized as a defense where ignorance of undisputed law or disregard of that law has been demonstrated. Public officials are held to a standard of conduct based not only on permissible intentions but also on knowledge of the basic, unquestionable constitutional rights. *Duchesne v. Sugarman, supra,* at 832; *Mack v. Johnson,* 430 F.Supp. 1139, 1147 (E.D.Penn.1977); *Atcherson v. Siebenmann,* 605 F.2d 1058 (8th Cir. 1979). The testimony of the defendants demonstrates their subjective good faith in adopting the affirmative action policy. The evidence clearly demonstrated that defendants' action in adopting the affirmative action plan was motivated in large part by their fear that if such a plan was not adopted the requirements of Title VII could not be met. Moreover, all of the defendants were unaware of the actions of individuals in the personnel department of which plaintiff complained.

■ The evidence established that the only connection of the members of the Police Board with the allegations contained in plaintiff's case was their approval of adoption of an affirmative action policy in an attempt to comply with the requirements of federal law. At the time this policy was adopted there was no indication that such a policy, adopted for the purpose of insuring compliance with the requirements of Title VII, might in some way be a violation of the Equal Protection Clause, nor could the defendants have reasonably been expected to know of this potential constitutional problem. The Supreme Court in *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978) held that public officials cannot reasonably be

expected to be aware of a particular constitutional right that has not yet been declared. Public officials are not charged with predicting the course of constitutional law. They should be held to a standard of conduct based upon knowledge of basic and unquestionable constitutional rights at the time of their action. The Court thus finds that the Police Commissioners and the Police Chief meet the objective requirements of the good faith defense and that their actions were totally consistent with established law at the time they adopted this affirmative action plan.

 It is fairly well established that the burden is on the defendant to establish the elements of a good faith defense. *Mack v. Johnson, supra,* at 1147. However, the mere fact that the defendant must establish that he is entitled to this qualified immunity does not mean that he is not entitled to a directed verdict. In *Dellums v. Powell,* 566 F.2d 167 (D.C.Cir. 1977) Judge Skelly Wright set forth the standard for a directed verdict in this situation. Before the defendant is entitled to a directed verdict on the basis of a qualified immunity he must demonstrate that on each element of the immunity defense the facts, taken in a light most favorable to plaintiff, are so clearly in the defendants' favor that reasonable men could entertain no doubt with regard thereto. The Court found that the defendants for the above cited reasons had met this burden with respect both to the objective and subjective elements of the good faith defense. The Court notes that in this case the defendants did not actually present evidence on the good faith qualified immunity defense as part of their case in chief. Defendants, however, were all called by plaintiff and it was their uncontradicted testimony that is the basis for the Court's judgment that they are entitled to a directed verdict on the issue of qualified immunity. In this situation it is proper to find that the defendants have met their burden. *McGhee v. Draper,* 564 F.2d 902 (10th Cir. 1977).

 Although the defendants' lack of personal involvement and qualified immunity provided a sufficient basis on which to direct a verdict, the Court believed that the parties were entitled to a ruling on the constitutionality of the affirmative action program. In evaluating plaintiff's claims that the Equal Protection Clause has been violated the Court must first determine the standard of judicial review to be applied. The Supreme Court has employed at least two standards of review: (1) the traditional rational basis test wherein classifications are constitutional if they bear a rational relationship to a permissible state interest *Dandridge v. Williams,* 397 U.S. 471, 485–86, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970) and (2) the standard of strict judicial scrutiny wherein classifications are constitutional only if they are necessary to promote a compelling state interest. *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). See, *Gault v. Garrison,* 569 F.2d 993 (7th Cir. 1970); *LaBauve v. La. Wildlife & Fisheries Com'n.,* 444 F.Supp. 1370 (E.D.La.1978). This latter test is applied where state created classifications interfere with the exercise of a fundamental right or involve a suspect classification.

In *Regents of the U. of Calif. v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) petitioner argued that the court had erred in reviewing the special admissions program under the "strict scrutiny" level of review. Petitioner argued that the court should adopt a more restrictive view of the Equal Protection Clause and hold that discrimination against members of the white majority cannot be suspect if its purpose can be characterized as "benign." Justice Powell rejected this argument and indicated that where classifications touch on an individual's race or ethnic background he is entitled to a judicial determination that the burden he is asked to bear is tailored to serve a compelling government interest. The Court finds Justice Powell's reasoning persuasive and has determined that although significant difference existed between the special admissions program in *Bakke* and the selection process in this case the standard of strict scrutiny will be applied.

The courts have consistently held that a state which adopts a suspect classification "bears a heavy burden of justification," *McLaughlin v. Florida,* 13 L.Ed.2d 222 (1964). This burden requires the state to show that its purpose is constitutionally permissible and that its use of the classification is necessary to the accomplishment of this purpose and does not unnecessarily burden constitutionally protected rights. *Bakke, supra,* 438 U.S. at 305, 98 S.Ct. at 2756, 57 L.Ed.2d at 781; *In re Griffiths,* 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973).

In *Bakke,* Justice Powell indicated that the goal of assuring a specific percentage of a particular ethnic group in the university's student body was not a valid goal. However, he indicated that the goal of increasing the number of physicians who would practice in minority communities currently underserved by the medical profession was a permissible state goal. However, there was no evidence of record that the special admissions program was needed or geared to promote that goal.

In the instant case the defendants as well as Patrick Murphey testified that minority representation on the police force approximately equivalent to the percentage of minorities in the community was desirable in that adequate minority representation tended to foster better public relations between the public and those individuals employed to serve them. The absence of police officers of a minority race serving in areas with large minority populations tended to increase hostility and violence in those areas. Evidence adduced by those witnesses indicated that, a metropolitan police force with adequate minority representation was likely to be a far more efficient police force.

This Court believes that the state has a legitimate goal in trying to assure adequate minority representation on the police force.

The final question becomes whether the methods utilized will actually promote this goal. In this case the evidence clearly demonstrated that the employment practice of placing minorities in the next available offi-cer training class will ultimately provide the police department with a more balanced police force. In this case, unlike *Bakke,* because the police department is responsible for the work assignments of police officers, minority individuals can be placed in areas where their presence is needed to insure more harmonious relations and a more effective police force.

Thus the Court finds that the employment practices challenged by plaintiff met a compelling government interest and do not violate the Equal Protection Clause.

For all of the above reasons, it was this Court's decision that the defendants' motion for a directed verdict at the close of all of the evidence should be granted.