Frank BROWN, et al., Plaintiffs,

v.

Lamar ALEXANDER, et al., Defendants.

No. 79–3401.

United States District Court,
M. D. Tennessee,
Nashville Division.

June 12, 1981.

George E. Barrett, Michael Passino, Patricia R. George, Charles Ray, Nashville, Tenn., for plaintiffs.

A. L. Zwerdling and Janet Kohn, Washington, D.C., for amicus curiae AFSCME, AFL–CIO.

Robert L. Ballow, Eddie Wayland, Daniel C. Kaufman, Nashville, Tenn., for defendant Lamar Alexander.

Robert Littleton, Sp. Asst. Atty. Gen., and C. Hayes Cooney, Chief Deputy Atty. Gen., Nashville, Tenn., William P. Hutcheson, Chattanooga, Tenn., for defendants Bradley and Koch.

Charles W. Cross, Nashville, Tenn., for defendant TSEA.

## MEMORANDUM

WISEMAN, District Judge.

■ Plaintiffs in this action are Frank Brown, Silas Upchurch, and Rufus Turner, guards in the Tennessee prison system, their union, Local 1308 of the American Federation of State, County, and Municipal Employees, and AFSCME Local 2173.[1] Defendants are Lamar Alexander, Governor of Tennessee, Harold Bradley, Commissioner of Correction, William Koch, Commissioner of Personnel, and the Tennessee State Employees Association [TSEA].[2] Plaintiffs[3]

---

1. Local 2173's motion to intervene was granted January 2, 1980.

2. TSEA's motion to intervene was granted January 23, 1980.

3. Plaintiffs initially attempted to pursue this case as a class action. The burden is on plaintiffs to establish their ability to maintain a class action, *Senter v. General Motors Corporation*, 532 F.2d 511, 522 (6th Cir.), *cert. denied*, 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976). Five months after filing their complaint, plaintiffs attempted to comply with Local Rule 14, which requires allegations of fact thought to justify class certification. At three hearings held in this case on February 5 and June 27, 1980, and May 20, 1981, plaintiffs have not put on any proof entitling them to class certification. At the most recent hearing, plaintiffs rested their case on a stipulation, *see infra*, none of which justifies class certification. Moreover, plaintiffs had asked in their motion for class certification for the class action hearing to be consolidated with the trial on the merits. Two orders of this Court setting the most recent hearing date stated that the hearing was to be held "on the merits." *See* Orders of March 3, 1981, and April 10, 1981. Nevertheless, plaintiffs were content to rest on the meager stipulation. Accordingly, plaintiffs have failed to carry their burden concerning

allege violation of their constitutional rights under the first amendment, the equal protection clause, and the privileges and immunities clause.[4] Plaintiffs seek injunctive and declaratory relief and attorney's fees. This Court has jurisdiction under 28 U.S.C. § 1331.

### History of the Case

Plaintiffs' basic quarrel is with the effect of Tenn. Code Ann. § 8–23–204, which deprives them and their unions of the benefit of payroll deductions for union dues. Prior to the enactment of section 8–23–204 in 1977, a union representing mental health employees, Local 150–T, had a Memorandum of Understanding with the State that entitled them to a dues checkoff. Local 150–T sought to enforce the Memorandum in state court and was denied relief. Chancellor Cantrell's opinion did not address the claims raised by plaintiffs in ' this case. Local 150–T is not a party to this litigation. Local 1308 asserts that the state also had a tacit understanding with them. Local 2173 was the beneficiary of a dues checkoff before section 8–23–204 was enacted. Thereafter, only defendant, TSEA, was accorded

the privilege of a dues checkoff. Plaintiffs' challenge centers on this disparate treatment.

In 1977, the Tennessee General Assembly enacted a statute that provided for payroll deductions for association dues if the association was independent, domestic, in favor of an efficient and effective work force for state government, and the representative of at least 10 percent of the employees who qualified for membership.[5] On August 16, 1979, plaintiffs brought this action challenging the constitutionality of that statute. On January 3, 1980, this Court issued a temporary restraining order because the requirement that an association be independent or domestic appeared to violate the equal protection clause or the privileges and immunities clause of the federal Constitution. See Order of January 3, 1980. Consent to this TRO expired on February 5, 1980, when a hearing was held on the application for preliminary injunction. The Tennessee General Assembly, supposedly in response to the concerns of this Court, see remarks of Rep. Rhinehart, March 25, 1980, amended the statute on March 27, 1980. The 1980 version, however, retains the sub-

---

class certification and their attempt to proceed in that fashion is denied.

**4.** Plaintiffs attempted to amend their complaint to raise four more federal claims: (1) that defendants conspired to violate plaintiffs' constitutional rights of free speech and association, in violation of 42 U.S.C. § 1983; (2) that defendants conspired to deprive plaintiffs of equal protection, in violation of 42 U.S.C. § 1985; (3) that 42 U.S.C. § 1986 allows plaintiffs to recover against defendants for their failure to protect plaintiffs' rights under section 1985; and (4) that the Tennessee statute violates the privileges and immunities clause of Article IV. Plaintiffs also sought three claims under Tennessee law, to be attached as pendent claims. By order of March 4, 1981, this Court denied plaintiffs' motion to amend their complaint. By order of March 5, 1981, plaintiffs were allowed to pursue the privileges and immunities claim of the amended complaint.

Plaintiff-intervenor adds an allegation of conspiracy to deprive plaintiffs of their constitutional rights under 42 U.S.C. § 1985(3). The Court holds at this time that plaintiff-intervenor's conspiracy allegation must fall for the reasons stated in the order of this Court of March 4, 1981.

**5.** Officers and employees in the several departments and agencies of the state subject to appointment by the Tennessee department of personnel may authorize deductions to be made from their compensation for the payment of membership dues in any independent domestic employee association. Such deductions shall be made by the commissioner of finance and administration from the compensation of such officers and employees. It shall be necessary for any such association to have as one of its objectives the promotion of an efficient and effective work force for state government in Tennessee. Its chief administrative officer must certify annually to the commissioner of finance and administration that it has a current membership of not less than ten percent (10%) of all such officers and employees who qualify for membership therein. However, the above certification shall not be required for the renewal or continuation of a lawful agreement between an agency and a representative of its employees entered into prior to July 1, 1977.

Acts 1977, ch. 143, § 1 (current version at Tenn. Code Ann. § 8–23–204 (1980)).

stance and most objectionable portions of the earlier statute.[6]

### Legislative History

Because the 1977 and 1980 versions of the payroll deduction statute are virtually identical, the legislative histories of both are relevant. The purpose of the 1977 act was to extend dues checkoffs to the Tennessee State Employees Association. Standing, nonstatutory agreements were understood to exist between the State and other unions, including plaintiffs AFSCME locals, and the legislature did not intend to interfere with those agreements. The 1977 legislation reflected this concern in a grandfather clause. Certification of ten percent membership was not required "for the renewal or continuation of a lawful agreement between an agency and a representative of its employees entered into prior to July 1, 1977" (the effective date of the legislation). Acts 1977, ch. 143, § 1 (current version at Tenn. Code Ann. § 8–23–204 (1980)). From the Senate debates the concern was obviously to obtain a dues checkoff for the TSEA.

Senate Bill 448, which I want to move for adoption on third and final reading, and then offer an amendment, is a bill to authorize voluntary payroll deductions for the State Employees Association. The, as you know, we already allow, by statute, deductions for the Tennessee Education Association, and also those union affiliated organizations. We have several American Federation of State and County Municipal Employees, which is AFL, and Service Employees International, which is AFL, and this bill would just extend that same benefit to the employees association, which is not a union.

Senate Debates of March 30, 1977, Transcript at 1 (remarks of Sen. White). When asked point blank what association the bill was for, Senator White replied, "The Tennessee State Employees Association. They are not a union." *Id.* at 3. Senator Henry described the TSEA as follows:

It was begun three or four years ago by middle management and professional people, career people in state government. It has as its objectives the same objectives as any professional or management association, it merely relates to state government rather than private employment. It is not to be confused with other organizations with different memberships and objectives. It is a perfectly

**6.** (a) Officers and employees of the state may authorize deductions to be made from their compensation for the payment of membership dues in any employee associations or organizations that meet all of the following criteria:

(1) Grants membership to all regular employees in the executive branch of state government who seek membership regardless of title, position, location, or department;

(2) Grants the same rights and privileges of membership to all employees who seek membership therein;

(3) Provides the same kind and degree of services to all members regardless of rank, position, title, or location within Tennessee;

(4) Has at least twenty percent (20%) of the employees in the executive branch of state government as members;

(5) Has as one (1) of its objectives the promotion of an efficient and effective work force for state government in Tennessee, and if affiliated in any manner with another organization, the other organization shall have similar objectives;

(6) Is an independent employee organization including, but not limited to, those who are not required to have their charter or bylaws approved by a parent or affiliate, cannot be required to merge with another employee organization or unit, cannot have its membership dues established by an affiliate or parent, cannot be taken control of by a parent, affiliate or other labor organization for any reason whatsoever; and

(7) Is itself a wholly domestic employee organization which is not a part of a multi-state employee organization which controls it or has any right of control.

(b) The chief administrative officer of any organization seeking deduction and payment of dues must certify initially and annually to the department of finance and administration that it meets each separate requirement set forth in subsection (a). The procedure for payroll deduction shall be in accordance with procedures established by the department of personnel and the department of finance and administration. The commissioner of finance and administration shall have no authority to deduct and pay over membership dues to any organization except as provided herein. Tenn. Code Ann. § 8–23–204 (1980).

proper and respectable and altogether praiseworthy effort of our career state employees to improve their job situations and their job performances and the attractiveness and better functioning of the public service for career middle management employee people. It is entirely worthy of your confidence and I hope you will pass the bill.

*Id.* at 7.

The debate in the House was more confused. The bill was amended to deny checkoff to any organization that advocated or participated in a strike, but the House later receded from that position. Confusion regarding measurement of the ten percent level abounded. In answering questions about the bill, the sponsor, Representative Rhinehart, repeatedly stated that the bill required ten percent of the employees of a *Unit.* When asked to define a unit, the sponsor gave an unresponsive answer.[7]

The only substantive debate of the 1980 bill occurred in the House. Representative Rhinehart described the 1980 bill as a "back up" if the law was held unconstitutional. House Debate Tape, March 25, 1980. The best illustrator of legislative intent regarding the 1980 bill is the preamble.

WHEREAS, it is in the interest of the Citizens of Tennessee to provide payroll deductions for employee organizations that have as an objective the promotion of an effective and efficient work force in state government; and

WHEREAS, it is, therefore, desirable to favor employee organizations which are considered large enough to promote employee stability and peace rather than favor numerous or small quarrelling employee organizations; and

WHEREAS, it is also desirable to favor employee organizations whose roots are in Tennessee; who are not subject to control by an organization whose members do not pay taxes in Tennessee and

whose interests do not match those of Tennessee State government; and

WHEREAS, it is desirable to favor employee organizations that grant memberships to all state employees with equal rights and privileges as opposed to those employee organizations which stratify and segment the work force . . . .

The 1980 bill differed from the 1977 version in two significant respects: the minimum percentage of membership was raised from ten to twenty percent and the grandfather clause was dropped.

### Plaintiffs' Case

Plaintiffs have limited their proof to the statutes and their legislative histories, the depositions, and a stipulation. For the most part the depositions are of little help. As plaintiffs' counsel pointed out, however, that the TSEA sponsored and lobbied for this legislation can be learned from the depositions; yet, this is neither surprising nor probative. The parties stipulated that the TSEA is the only organization qualified and receiving a payroll deduction for dues under section 8–23–204, that organizational plaintiffs do not possess dues checkoff authorization from more than twenty percent of state employees, that organizational plaintiffs are not domestic or independent, and that no further proof would be offered in this lawsuit.

Plaintiffs allege that the first amendment, as incorporated through the due process clause of the fourteenth amendment, is violated because the statute conditions eligibility to receive a governmental benefit upon relinquishment of associational rights. Because the statute classifies employees and grants or denies benefits based upon their exercise of the fundamental right of association, plaintiffs argue, it violates the equal protection clause of the fourteenth amendment. Finally, plaintiffs urge that

---

7. *Rep. Murphy:* Now what is the definition of a unit.
*Rep. Rhinehart:* Well, that would be, I would think, your, they did have a Tennessee Highway Patrol Association, I think that is dead, I don't believe it functions much any more.

They now have a Tennessee State Employees Association which, as far as I know, would be the only one other than the guards at Brushy Mountain would comply with this bill, Mr. Murphy.
House Debates, April 11, 1977, transcript at 13.

the statute runs afoul of the privileges and immunities clause, U.S.Const. art. IV, § 2, cl. 1, by discriminating against citizens of other states solely because they are citizens of other states.

## Standing

Defendants argue that plaintiffs lack standing to challenge the constitutionality of section 8–23–204 because they do not stand to gain or lose by this Court's resolution of the issues raised. *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). According to defendants, organizational plaintiffs' failure to comply with the twenty percent requirement of subsection (4) bars their challenge of the statute because victory on the other sections would still not entitle them to a dues checkoff. The Court holds, however, that plaintiffs have a sufficient stake in the litigation to obtain judicial relief.

The test for standing is "whether the party alleges that the challenged action has caused him injury in fact, economic or otherwise." *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). That Local 2173 has suffered injury in fact is indisputable; the passage of section 8–23–204 resulted in the cessation of their dues checkoff. Local 1308 likewise passes the injury in fact requirement because the enactment of 8–23–204 severely diminished its chances of ever receiving a dues checkoff by virtue of the effect of the challenged portions of the act. Individual plaintiffs have suffered injury in fact insofar as it deprives them of the benefit of a dues checkoff because of their attempted affiliation with a national organization.

Defendants' standing attack centers on the causation element emphasized by the Supreme Court in *Simon v. Eastern Kentucky Welfare Rights Organization, supra*. The question under *Simon* is whether "the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision." 426 U.S. at 38, 96 S.Ct. at 1924. Plaintiffs ask for injunctive relief compel-

ling the state to provide them with a dues checkoff and/or a declaratory judgment that section 8–23–204 is unconstitutional. Defendants' opposition to plaintiffs' standing presumes that the twenty percent requirement is constitutional and therefore plaintiffs will not receive the checkoff even if their arguments prevail. Plaintiffs meet the *Simon* test. They challenge the whole statute. The injury they have suffered is not speculative. Defendant, TSEA, asserts in its motion to intervene that loss of the payroll deduction could be fatal to its existence. Plaintiffs have already been hit with loss of the checkoff and continue to suffer under a discrimination that cannot help but hinder their associational efforts. Being disqualified for a checkoff because of attempted affiliation with a national organization strikes to the very core of the standing concerns expressed by the Supreme Court in *Simon*. Plaintiffs do not have to prove that they are entitled to all the relief requested in order to establish standing.

## First Amendment Claim

Plaintiffs' first amendment claim is grounded in the right to associate that is implicit in the first amendment guarantees of freedom of speech, assembly, and petition. In *Healy v. James*, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972), the Supreme Court held that a state-supported institution of higher learning could not refuse unjustifiably to recognize an organization of students. "There can be no doubt that denial of official recognition, without justification, to college organizations burdens or abridges ... associational right[s]." *Id.* at 181, 92 S.Ct. at 2346, 33 L.Ed.2d at 279.

The group in question in *Healy* was the SDS. When the case arose college administrators expressed concern over violence on campuses across the country; SDS chapters had been a "catalytic force" on some campuses. Denial of recognition kept the students from meeting in the campus coffee shop, from using the campus bulletin boards, and from using the student newspaper. Students were not banned from join-

ing SDS; they could meet off campus, and even distribute written material on campus. The Court held, however, that although the administration's actions were not direct restrictions, the "Constitution's protection is not limited to direct interference with fundamental rights." *Id.* at 183, 92 S.Ct. at 2347, 33 L.Ed.2d at 280. The disabilities imposed by the administration's refusal to recognize the group were sufficient to burden associational rights, even though association was not prohibited altogether.

Once the Court determined that an associational right was burdened, for the restriction to stand "the State must demonstrate that the action taken is reasonably related to the protection of [a legitimate and substantial state] interest and that 'the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.'" *Id.* at 189 n. 20, 92 S.Ct. at 2350 n.20, 33 L.Ed.2d at 284 n.20 (quoting *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672, 680 (1968)). Therefore, the three issues relevant for first amendment analysis are:

1. Is an associational right burdened?
2. Has the state demonstrated a legitimate and substantial interest in the restriction?
3. Is the restriction strictly tailored to further that interest?

In *Healy,* the administration's justifications did not fit this test. The university sought, in the Court's view, to deny recognition because of what the local or national SDS organization advocated, rather than what it did. The distinction between advocacy and action is very significant in these cases. The administrator disapproved of the group's philosophy because he viewed it as advocating the destruction of the ideal of academic freedom. Whether the group, locally or nationally, advocated destruction was irrelevant, the Court noted, because the state "may not restrict speech or association simply because it finds the views expressed by any group to be abhorrent." *Id.,* 408 U.S. at 187–88, 92 S.Ct. at 2349, 33 L.Ed.2d at 283.

The cases following *Healy* have held to its mandate. State institutions cannot deny recognition to gay rights organizations, *Gay Lib v. University of Missouri,* 558 F.2d 848 (8th Cir. 1977), *cert. denied sub nom. Ratchford v. Gay Lib,* 434 U.S. 1080, 98 S.Ct. 1276, 55 L.Ed.2d 789 (1978); *Gay Alliance v. Matthews,* 544 F.2d 162 (4th Cir. 1976); *Gay Students Organization v. Bonner,* 509 F.2d 652 (1st Cir. 1974); *Student Coalition for Gay Rights v. Austin Peay State University,* 477 F.Supp. 1267 (M.D.Tenn.1979) (Wiseman, J.), or deny a Nazi group the use of a school auditorium, *National Socialist White People's Party v. Ringers,* 473 F.2d 1010 (4th Cir. 1973). The instant case does not involve recognition per se; it involves the conferral of a benefit, a payroll deduction plan, for one group of employees and not another.

By providing a dues checkoff for TSEA, the state supports that group's organizational and associational activity. The ability to maintain an effective organization is impaired by the denial of a dues checkoff. The Supreme Court has held, however, that in the state employee union context, impairing the effectiveness of a group does not unconstitutionally burden associational rights. *Smith v. Arkansas State Highway Employees,* 441 U.S. 463, 99 S.Ct. 1826, 60 L.Ed.2d 360 (1979).

In *Smith,* the State Highway Commission refused to hear grievances filed by the state employees union; it would only hear grievances filed by the individual employees. The Court held that although the effectiveness of the union was impaired, the Commission's refusal was not prohibited by the Constitution. "[T]he First Amendment does not impose any affirmative obligation on government to listen, to respond or, in this context, to recognize the association and bargain with it." *Id.* at 465, 99 S.Ct. at 1828, 60 L.Ed.2d at 363. In a case following *Smith,* the Eighth Circuit held that the discontinuation of a dues checkoff for state employee unions did not invoke the constitutional prohibition against impairment of freedom of association, because it merely impaired the effectiveness of the union.

*Arkansas State Highway Employees Local 1315 v. Kell*, 628 F.2d 1099 (8th Cir. 1980).

■ Although this Court has difficulty distinguishing between the refusal to recognize all student organizations, thereby denying use of bulletin boards and other university facilities, and the refusal to provide dues checkoff for all employee groups, unless some legitimate state interest would be fostered, plaintiff's first amendment claim must fail—even though no legitimate interest may be fostered by the plan—because it merely impairs the effectiveness of the associational activity.

Before *Smith*, one district court held that associational rights were infringed on facts similar to the instant case. The district court held that the denial of use of university facilities to a faculty group that supported collective bargaining while allowing a faculty group with opposite views to use the facilities, violated the first amendment.[8] *University of Missouri v. Dalton*, 456 F.Supp. 985 (W.D.Mo.1978). The district court specifically found that "but for . . . [the] advocacy of collective bargaining, [a certain faculty organization] would have been permitted the use of campus meeting rooms and campus mail." *Id.* at 995. Missouri law prohibited university faculty members from collectively bargaining with the university. The court specifically found that the faculty group was not likely to engage in lawless activity.

Very important to the *Dalton* holding was the finding that the faculty group's advocacy of collective bargaining was the sole reason for the university's decision not to allow the group to use university facilities. Even though the group had no independent right to use the facilities, the state " 'may not deny a benefit to a person on a basis that infringes his constitutionally protected interest—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms

would in effect be penalized and inhibited.' " *Id.* at 997 (quoting *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570, 577 (1972)). The district court held that first amendment rights were infringed without inquiry into whether only effectiveness was impaired, because the state was denying benefits on account of the group's beliefs and because *Healy v. James, supra,* established that denial of use of facilities " 'cannot be viewed as insubstantial.' " *Id.* at 996 (quoting *Healy v. James, supra,* 408 U.S. at 182, 92 S.Ct. at 2346, 33 L.Ed.2d at 280).

If the denial of benefits merely impairs the effectiveness of associational activity, *Smith v. Arkansas State Highway Employees* prevents a holding that the Tennessee statute is violative of the first amendment. Difficult to square are the impediments that the Supreme Court found substantial in *Healy v. James, supra,* and the approach toward effectiveness in *Smith*. The *Healy* approach, however, seems to go to the organizational ability of the group, its ability to meet and communicate at the most basic level. The approach of the Court in *Smith* is concerned with governmental treatment of associational activity; the government has no affirmative obligation to ensure the effectiveness of an association's activity. The denial of a dues checkoff was held by the Eighth Circuit merely to impair effectiveness, without any specific finding concerning its effect on organizational ability. A specific finding that the statute was passed to diminish plaintiffs' organizational ability, particularly with some inference of opposition to ideals espoused by the union receiving the checkoff, would seem to move the case more into the organizational or *Healy* type category than the impairment of effectiveness cases. Absent such a finding, plaintiffs' first amendment claim falls.

An association or organization must have "as one (1) of its objectives the promotion of an efficient and effective work force for state government in Tennessee." Tenn.

8. The court also held that the equal protection clause was violated. *See* text accompanying note 13 *infra.*

Code Ann. § 8–23–204(a)(5) (1980), in order to qualify for a dues checkoff. This requirement evokes two first amendment problems: (1) it appears to condition conferral of a benefit on advocacy of certain beliefs, and (2) it may lodge too much discretion in the administrator of the statute so that his whim would grant or deny the checkoff based on what an association supported.

In *Police Department v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972), the Supreme Court invalidated under the equal protection clause a Chicago ordinance that prohibited all picketing next to a school except peaceful labor picketing. That the law described permissible picketing in terms of its message was the central problem in the case.

> [U]nder the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. . . . Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say.[9]

Plaintiffs urge that this statute discriminates against them because of the ideas they espouse. Defendants respond by denying any distinctions based on ideas, noting that the payroll deduction system for association dues is merely a bookkeeping scheme.

■ Although the dues checkoff provision may be a mere bookkeeping system, once a benefit is conferred that supports associational activity in a significant way the government may not deny that benefit to other associations based on ideas or objectives of that association, so long as no imminent lawless action is likely to occur. *See Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430, 434 (1969).

The TSEA's associational activity is benefited by the dues checkoff. The TSEA admits in its motion to intervene that loss of the dues checkoff will cause it substantial harm or loss of membership. Defendants have never contended that conferring a dues checkoff on plaintiffs would result in imminent lawless activity. Thus, the issue becomes whether the law denies the benefit because of ideas or objectives of an association. Subsection (5) forces the conclusion that conditions are placed on the field of ideas that associations may espouse. Moreover, subsection (5) confers too much discretion on the administering official. *See Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). The vagueness of the requirement in subsection (5) has great potential for use against unwanted associations, and plaintiffs have even been threatened with disqualification under this subsection because of their affiliation with employees of other states.[10]

Because *Mosley* dealt with a more pure brand of speech and a more direct intrusion on its exercise than is involved in this case and because the Supreme Court struck the law under the equal protection clause, this Court is reluctant to strike the law on first amendment grounds. The foregoing analysis, as in *Mosley,* however, applies equally well in considering the equal protection

---

**9.** *Id.* at 96, 92 S.Ct. at 2290, 33 L.Ed.2d at 217.

**10.** Exhibit 4, is a letter from Robert Ballow, counsel for defendant, Lamar Alexander, to George Barrett, plaintiffs' counsel, in which disqualification under subsection (5) is asserted even after this Court's temporary order restraining enforcement of the 1977 version's domesticity and independence requirements.

> [AFSCME] does not appear to be an association of employees of the State of Tennessee having as an objective "the promotion of an efficient and effective work force for state

government in Tennessee." Rather, as stated in its Constitution, its membership consists of employees of "any state, territory, commonwealth, county, district, school board, city, town, village, township, or other public authority or any governmental sub-division of any such government or authority," and its stated objectives have nothing to do with the promotion of an efficient and effective work force for state government in Tennessee or anywhere else.

clause. The Court's refusal to find a first amendment violation is significant because now the Court need only find a rational basis for the statute.

## Equal Protection

The equal protection clause of the fourteenth amendment requires " 'some rationality in the nature of the class singled out.' " L. Tribe, American Constitutional Law 995 (1978) (quoting *Rinaldi v. Yeager*, 384 U.S. 305, 308–09, 86 S.Ct. 1497, 1499–1500, 16 L.Ed.2d 577 (1966)). When fundamental rights are involved, however, the Supreme Court strictly scrutinizes the law in question and will strike it absent a compelling governmental function. *Id.* at 1000–02. Strict scrutiny usually results in finding the statute unconstitutional, and correlatively application of minimum rationality usually results in the ultimate validity of the statute. The Supreme Court applies intermediate review when certain classifications are involved (e. g., gender and age). *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). Plaintiffs argue that their fundamental rights of freedom of association and freedom of speech are infringed by the statute and therefore the statute must fall unless the State establishes a compelling justification for it. Furthermore, plaintiffs argue, the law invidiously discriminates against plaintiffs because of the views espoused by their union. In other words, plaintiffs claim that because their associational rights are implicated their equal protection claim is entitled to strict scrutiny, or at least intermediate review.

The Court must consider plaintiffs' claim under the rational basis test. Plaintiffs have no fundamental right to a dues checkoff. As the Supreme Court noted in *City of Charlotte v. Local 660, International Association of Firefighters*, 426 U.S. 283, 96 S.Ct. 2036, 48 L.Ed.2d 636 (1976), plaintiffs' status as union members does not entitle them to special treatment. Reasonableness is the proper test even if the State's withdrawal

of the benefit was because of their union membership. *Id.* at 286, 96 S.Ct. at 2038, 48 L.Ed.2d at 640.

A statute examined under the rational basis test will not be overturned unless "the varying treatment of different groups of persons is so unrelated to the achievement of any combination of legitimate purposes that [the Court] can only conclude that the legislature's actions were irrational." *Vance v. Bradley*, 440 U.S. 93, 97, 99 S.Ct. 939, 943, 59 L.Ed.2d 171, 176 (1979). A finding of hypothetically legitimate state interests to which the statute relates rationally will support a ruling upholding the statute. *Malmed v. Thornburgh*, 621 F.2d 565 (3rd Cir.), *cert. denied*, — U.S. —, 101 S.Ct. 361, 66 L.Ed.2d 219 (1980). *See McGowan v. Maryland*, 366 U.S. 420, 425–26, 81 S.Ct. 1101, 1104–1105, 6 L.Ed.2d 393 (1961); L. Tribe, *supra*, at 996.

Held rational in *Charlotte* was the city's refusal to allow plaintiffs' union a dues checkoff. Because the city withheld money from paychecks for payment to various other programs and organizations,[11] plaintiffs argued, it could not arbitrarily refuse to withhold amounts for the union. The Court held that the city's justification of allowing withholding only for programs of general interest in which all employees of the city or department could participate was legitimate. The city argued that financial and administrative burdens justified its refusal to extend checkoffs to the union, and the Court agreed.

> [T]he city has not drawn its lines in order to exclude individual deductions, but in order to avoid the cumulative burden of processing deductions every time a request is made....

*Id.* at 288, 96 S.Ct. at 2040, 48 L.Ed.2d at 642.

The Sixth Circuit has upheld an exclusion of a minority union from a dues checkoff program as rational under the equal protection clause. In *Memphis American Federation of Teachers, Local 2032 v. Board of*

---

11. The city allowed withholding for taxes, retirement-insurance, savings, and certain charities. *Id.*, 426 U.S. at 287, 96 S.Ct. at 2039, 48 L.Ed.2d at 641.

*Education*, 534 F.2d 699 (6th Cir. 1976), a dues checkoff for members of a union, representing two-thirds of the employees, but not the union representing other employees, was upheld as reasonable because it was rationally related to the valid state interest of promoting labor peace. The promotion of labor stability was the only justification relied on by the Sixth Circuit in *Memphis*. *Id*. at 703.

### The Domesticity and Independence Requirements

The issue is whether the limitation of eligible employee organizations to "wholly domestic . . . organization[s]," Tenn.Code Ann. § 8–23–204(a)(7), and "wholly independent and unaffiliated organizations," *id*. § 8–23–204(a)(6), has a rational basis. Defendants argue that the State has a privilege to limit its benefits to state residents. Domesticity requirements often raise constitutional problems under the commerce clause, the privileges and immunities clause, and the equal protection clause. The State relies on *Reeves, Inc. v. Stake*, 447 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980), to establish its absolute privilege to favor its own citizens over others. *Reeves*, however, dealt solely with the commerce clause, which is not implicated in this case.[12]

The State has conferred a benefit on the TSEA, which may use the Tennessee Department of Finance and Administration to obtain its dues. The benefit is not conferred on organizations that are in any way affiliated or associated with a multistate employee organization or any type national union.

To uphold the statute this Court must find a rational basis for the discrimination between domestic and national employee organizations. The discrimination will be upheld "if any state of facts reasonably may be conceived to justify it." *McGowan*

*v. Maryland*, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393, 399 (1961). The Court is concerned that the only reason for the State's distinction between these groups is that the national organizations may be more inclined to exercise valid first amendment rights on behalf of their employees. The district court in *University of Missouri v. Dalton, supra*, held that the equal protection clause was violated when a faculty group in favor of collective bargaining was not allowed to use university facilities while a faculty group opposed to collective bargaining was permitted the use of the facilities.[13] The state offered no compelling state interest or reason rationally related to a legitimate state objective to justify its differing treatment. 456 F.Supp. at 997.

> [W]hile the University has no obligation to provide the use of its facilities to faculty organizations once it does so, it cannot refuse to grant such facilities to one faculty organization in particular because of that organization's position in opposition to a certain state statute [outlawing collective bargaining with state employee unions], absent a compelling state interest.

*Id*.

The instant case is very similar to *Dalton*. Non-domestic groups are denied the benefit of a dues checkoff, while the TSEA is conferred that benefit. Not only is this a conferral of a benefit in this case, but the availability of a dues checkoff nurtures and is an affirmative aid to an employee organization. The state can choose not to support employee organizations through dues checkoff. *See City of Charlotte, supra*. The state can choose to benefit employee organizations for valid reasons. *See Memphis, supra*. But a state cannot choose to support one employee organization over another employee organization simply because members of one organization want to associate with persons from different states or

---

**12.** In *Reeves* a state owned cement plant was limited by a state commission to selling cement only to state residents. The Court upheld the rule against an attack based on the theory that it unconstitutionally burdened interstate commerce. In the absence of federal legislation, the state may participate in the market to effect a policy favoring its own citizens.

**13.** The Court also found that the policy violated the first amendment. *See* text accompanying note 8 *supra*.

who want to affiliate with other employee organizations.

■ Defendants urge that the legitimate purposes of the legislators were to nurture organizations whose roots are in Tennessee, whose members are not subject to control of non-Tennesseans, and whose members' interests match those of Tennessee state government.[14] Favoring organizations with "roots" in a state and whose interests match those of a state's government are not legitimate state interests. *See Police Department v. Mosley, supra; Healy v. James, supra; Gay Alliance v. Matthews, supra; University of Missouri v. Dalton, supra.* Moreover, requiring an individual not to associate with another from a different state in order to use a state benefit penalizes the right to associate, *see Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (year residency requirement violated right to travel), and the Court cannot *imagine* a justification to support such a requirement. *See Atkins v. City of Charlotte,* 296 F.Supp. 1068 (W.D.N.C.1969). Because this provision conditions the conferral of a benefit on the circumscription of associational rights, it violates the equal protection clause.

### Subsection (5)

■ The requirement of subsection (5), which provides that one of the objectives of the employee organization must be the "promotion of an efficient and effective work force for state government," Tenn. Code Ann. § 8–23–204(a)(5), falls under the equal protection clause. Governmental benefits that support associational activities cannot be conferred or denied because of a group's ideals or objectives. *See Police Department v. Mosley, supra.*[15]

### The Twenty Percent Requirement

Subsection (4) of the statute requires that an employee organization "ha[ve] at least twenty percent of the employees in the executive branch of state government as members." Tenn.Code Ann. § 8–23–204(a)(4) (1980). Although neutral on its face, plaintiffs challenge the requirement as part of the entire scheme to keep them out and the TSEA in. For equal protection purposes the Court must look for a legitimate state interest to which this subsection rationally relates.

■ As the Sixth Circuit recognized in *Memphis, supra,* a concern for labor peace is legitimate and a requirement that two-thirds status be achieved is rationally related to it. The preamble to section 8–23–204 evinces some concern for labor peace:

[I]t is . . . desirable to favor employee organizations which are considered large enough to promote employee stability and peace rather than favor numerous or small quarrelling employee organizations. . . .

Although the size group required by section 8–23–204 is smaller than the group in Memphis (twenty percent versus sixty-six and two-thirds percent), the minimum size requirement still bears some reasonable relationship to concerns for labor peace. It is not unreasonable for legislators to believe that requiring twenty percent of all employees to belong to an organization before conferring the checkoff upon the organization will promote labor peace by diminishing the number of quarrelling unions. Even though labor peace may not be achieved because units are not defined or because twenty percent is not sufficiently large to promote peace among state employee organizations, the legislature's attempted solution should stand. *See Williamson v. Lee Optical,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed.2d 563 (1955) (regulation of opticians upheld although ready-to-wear glasses sellers were exempted). "[T]he Constitution invalidates only that governmental choice which is 'clearly wrong, a

---

**14.** The only justifications offered by defendants come from the preamble to the statute:

[I]t is . . . desirable to favor employee organizations whose roots are in Tennessee; who are not subject to control by an organization whose members do not pay taxes in Tennessee and whose interests do not match those of Tennessee state government . . . .

**15.** *See* text accompanying note 9 *supra.*

display of arbitrary power, not an exercise of judgment.'" L. Tribe, *supra*, at 997 (quoting *Lindsley v. National Carbonic Gas Co.*, 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911)).

### Privileges and Immunities Claim

█ Because of this Court's resolution of plaintiffs' equal protection claims, the privileges and immunities issue need not be addressed except to note that the twenty percent requirement of subsection (4) withstands a privileges and immunities challenge because it does not discriminate between citizens and noncitizens. *See Toomer v. Witsell*, 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948).

### Severability

█ Having found some portions of section 8-23-204 unconstitutional, the Court must now consider the effect of the statute's severability clause [16] and the severability provision of the Tennessee code.[17] Juxtaposed against these indications of legislative intent to require severance is the opening provision of the statute, which provides that employees may authorize deductions for payments of dues in "any employee associations or organizations that meet *all* of the following criteria." Tenn.Code Ann. § 8-23-204(a) (emphasis added). This Court has held three of those criteria unconstitutional. In determining the severability of the unconstitutional provisions of a state statute, a federal court is bound by state law. *Cf. Moore v. Fowinkle*, 512 F.2d 629 (6th Cir. 1975). In Tennessee, severability is governed by the doctrine of elision. *Mayor and Aldermen v. Wilson*, 212 Tenn. 55, 367 S.W.2d 772 (1963).

The Sixth Circuit's opinion in *Moore v. Fowinkle, supra*, sets out the guiding principles of Tennessee law.

> When a statute contains one or more unconstitutional provisions, the obnoxious provisions will be eliminated and the statute sustained as to the rest, unless the invalid provisions are deemed so essential, and are so interwoven with others, that it cannot reasonably be presumed that the legislature intended the statute to operate otherwise than as a whole. . . .
>
> Where an invalid provision is incidental and subordinate and can be stricken without impairing the efficacy of the act, this will be done. . . .
>
> A severability clause must be taken into account in determining the legislative purpose unless observance thereof would frustrate the dominant legislative intent. . . .
>
> If possible, it is the duty of the courts to give effect to a severability clause and to make an elision, so as not to invalidate an entire act.

512 F.2d at 632 (citations omitted).

To eliminate the conflict between the "all criteria" requirement and the severability clauses the Court construes the opening passage as requiring organizations to meet all constitutional criteria. In applying the severability clause, the duty of this Court is

---

**16.** Section 4 of the statute provides that

> If any part, phrase, clause, section or sentence of this Act is found to be unconstitutional, all remaining parts of the act shall remain in effect there being a legislative intent that each part, phrase, clause or sentence shall stand alone with a separate purpose and reason for enactment.

Acts of 1980, ch. 792, § 4 (currently codified at Tenn.Code Ann. § 8-23-204, but severability section does not appear in the Code printing).

**17.** Tennessee's general severability statute provides that

> It is hereby declared that the sections, clauses, sentences and parts of the Tennessee Code are severable, are not matters of mutual essential inducement, and any of them shall be exscinded if the Code would otherwise be unconstitutional or ineffective. If any one or more sections, clauses, sentences or parts shall for any reason be questioned in any court, and shall be adjudged unconstitutional or invalid, such judgment shall not affect, impair or invalidate the remaining provisions thereof, but shall be confined in its operation to the specific provision or provisions so held unconstitutional or invalid, and the inapplicability or invalidity of any section, clause, sentence or part in any one or more instances shall not be taken to affect or prejudice in any way its applicability or validity in any other instance.

Tenn.Code Ann. § 1-3-110 (1979).

to determine whether the legislature would have passed the act without its obnoxious provisions.

The statute was passed to provide a dues checkoff for the Tennessee State Employees Association. The legitimate legislative purpose this Court found to sustain subsection four, advancement of labor stability, is not undermined by the elision of subsections (5), (6), and (7).

*Frost v. City of Chattanooga*, 488 S.W.2d 370 (Tenn.1972), illustrates when a court should refuse to elide a portion of a Tennessee statute. An act of the General Assembly concerning annexation affected only Hamilton County. The Tennessee Supreme Court struck that provision under the Tennessee Constitution and found the act unseverable because without it the act would have been incomplete—it would have thrown the annexation provisions upon all municipalities, which was obviously not what the legislature intended.

The General Assembly's desire to confer the benefit of a dues checkoff on the TSEA and other large employee groups is not obliterated by the nullification of subsection (5), (6), and (7), and therefore the doctrine of elision will be applied.

### Conclusion

Subsections (5), (6), and (7) of Tenn.Code Ann. § 8–23–204 are unconstitutional under the equal protection clause of the fourteenth amendment of the United States Constitution. Subsection (4) withstands constitutional attack because of its facial neutrality, and the doctrine of elision preserves the constitutional portions of the statute.